# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# ATHENS DIVISION

| | |
|---|---|
| GREAT DANE LIMITED PARTNERSHIP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. 3:08-CV-089 |
| | ) |
| STOUGHTON TRAILERS, LLC AND | ) |
| NEWCOURT, INC., | ) |
| | ) |
| Defendants. | ) |

## STOUGHTON TRAILERS, LLC'S CLAIM CONSTRUCTION BRIEF

Defendant Stoughton Trailers, LLC ("Stoughton"), through its counsel, Michael Best and Friedrich LLP, and Hall, Booth, Smith & Slover, P.C., respectfully submits its opening claim construction brief pursuant to LPR 6.5.

### *INTRODUCTION*

Unlike some patent cases involving sophisticated technology, this case presents two patents whose claimed inventions are relatively simple and easy to understand. The patents – U.S. Patent No. 6,652,018 ("the '018 patent") and 6,923,493 ("the '493 patent") – are both entitled "Trailer with Side Wall Having Laminate Panel." They relate to cargo trailers, familiar to anyone who drives on a highway. The claimed trailer (shown below) may be constructed with a floor, two side walls, a roof and wheels. The side walls will usually have vertical posts from floor to ceiling (item 50 in the figure below), and an exterior surface or skin (usually steel or aluminum). *See generally*, Col. 1, lines 15-22, col. 4, lines 45-50.[1] The side walls also have an

---

[1] The specification and figures of both the '018 and '493 patents are the same; accordingly, citations to columns and lines, as well as figures, are to the '018 patent unless noted.

inner surface formed of multiple liner panels. The asserted claims in this case generally focus on the trailer's "liner panel" (item 33 in the figure below).

Specifically, the patents claim a liner panel having a "tough" facer and a "stiff" backer. The parties do not contest those terms, but Stoughton will explain them for the Court's convenience and background information. According to the specification, "[t]he facer is 'tough' in that it is strong and resilient so that it normally dissipates energy when it deforms." Col. 5, lines 40-41. For illustrative purposes, the facer can be thought of as having the properties of steel or aluminum. Col. 5, line 38.

The backer, on the other hand, is "'stiff' in that it is substantially less ductile than a tough material … It does not deflect as much as the facer against lateral blows." Col. 5, lines 40-45. Again, for illustrative purposes, this can be thought of as wood or Styrofoam. Col. 5, lines 53-55.

Shown below is Figure 7, which illustrates, among other things, the backer 36 and the facer 35a, 35b.



FIG. 7

The claims of the two patents-in-suit describe different configurations of a trailer having liner panels with both a tough facer and a stiff backer, but each claim requires that two-part panel. In this brief, the terms that are in dispute concern generally the following concepts:

a. "Overhang" when used to describe the relationship between the facer and the backer;

b. "Covers" when used to describe both the overhang, and the relationship between the backer and the facer;

c. "Edge," "Edge surface," and "Vertical edge" when used to describe a portion of the backer;

c. "Recess" when used to describe how the panels fasten to the posts;

d. "Adjacent" when used to describe the location of panels in relation to each other; and

e. "Flange" and "Stepped down flange" when used to describe structures on the post that receive the liner panels.

*ARGUMENT*

I. <u>GOVERNING LAW</u>

The construction of claims in a patent case is a matter of law for the Court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In

construing patent claims, the Court looks first to the intrinsic evidence. The intrinsic evidence consists of the patent itself, the claim terms, the specification (or written description), and the patent prosecution history, if in evidence. *Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1346 (Fed. Cir. 2004). A court must interpret claim terms by using the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004). That intrinsic record includes the claims, the specification, and the prosecution history. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1317 (Fed. Cir. 2005).

The most important intrinsic evidence is the claim language. *See, e.g., Vitronics Corp. v. Conceptronics*, *Inc.* 90 F.3d 1576 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the scope of the patented invention.") Thus, the Court's focus must "begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d 1367, 1370 (Fed. Cir. 2005) (*quoting Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001)). When reading claim language, terms are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. *Phillips,* 415 F.3d at 1313-14.

That meaning of the claim is informed by the context provided by the specification. Indeed, "usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics,* 90 F.3d at 1582. "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips,* 415 F.3d at 1317. This does not mean that one may import

4

limitations from the specification, and indeed, Stoughton does not. For much of its argument, Stoughton will use the claim language informed by the specification in support of its interpretations.

Extrinsic evidence-such as expert and inventor testimony, dictionaries, and learned treatises-is only considered when the claim language remains genuinely ambiguous after considering all of the patent's intrinsic evidence. *Tegal Corp. v. Tokyo Electron America, Inc.,* 257 F.3d 1331, 1342 (Fed. Cir. 2001). In this case, the only extrinsic evidence offered by the parties is standard dictionary entries. Courts are free to consult dictionaries "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp.,* 90 F.3d at 1584 n. 6.

## II. PROPER CONTRUCTION OF THE DISPUTED TERMS

### A. Overhang

The term "overhang" is used in each asserted claim in the two patents-in-suit. As stated above, the claimed liner panel of every claim has a "stiff backer" and a "tough facer." The stiff backer can be generally visualized as a plywood, cardboard or Styrofoam board which is resistant to deflection or bending. It is covered by a facer, which is "tough," meaning it will deflect or bend rather than break. It is generally made of steel or aluminum. As described in the specification, "the backer helps the facer maintain its form, while the facer protects the backer from damage." Col. 5, lines 62-64.

The facer has an "overhang portion," shown in Figures 6-9 and 17 as element 37. Some embodiments call for this portion to merely extend beyond the edge of the backer. *See, e.g.,* '018 patent, Claim 1. Others require the overhang to fold over the edge. (Claims 2, 3, 18, 19, 21) Still another requires the overhang to not only fold over the edge but also fold over the opposite side of the backer, as well. (Claim 22) One claim (not asserted by Great Dane in this case)

5

recites that the overhang folds away from the edge surface. (Claim 6) In each instance, however, the presence of an overhang portion is intentional – it is not merely a function of the facer's manufacturing tolerances.

The patent describes an overhang of approximately one inch on each side of the backer. Col. 6, lines 12-14. The patent is quite clear that "the fold-over of the overhang, whether the overhang wraps around to the backer's opposite side or not, protects against facer fraying." Col. 7, lines 5-8. When the overhang merely extends beyond an edge, the extension is used to attach the panel to a flange of a post. *See, e.g.,* Col. 7, lines 21-27; Fig. 17. In short, the overhang portion serves a function. Even though a length of one inch is not required (*see* col. 6, ll. 22-27), both larger and smaller overhangs ***serve a purpose.***

In each case, the overhang is of sufficient dimension that it is capable of being folded over the backer or bent outward for attachment to a post. Accordingly, the term must be understood in functional terms. While there need not be any dimensional limitations to the overhang, an overhang cannot be so small or insignificant that it serves no purpose whatsoever or is incidental to manufacturing. An overhang must be of sufficient dimension that it can be folded over the edge or be of sufficient size to serve as an attachment.

**B.     Edge**

Asserted claims 1, 2, and 18 of the '018 patent, and 6, 7, 17, and 22 of the '493 patent contain limitations requiring that the overhang portion have a particular relationship to "an edge of said backer panel." *See, e.g.,* '493 patent, claims 6, 7, 17, 22. The parties disagree about the proper construction of this phrase and, in particular, the term "edge." Stoughton contends the phrase means, very simply, "the end of the backer panel." Great Dane broadly defines the terms as "a boundary where a thing begins or ends." By failing to confine the term to the patents'

context, Great Dane has proposed a construction that would seek to ensnare configurations far outside the reasonable scope of the patent as disclosed in the specification and figures.

Claim 1 of the '018 patent recites that the facer's overhang portion (defined above in section A) extends beyond an edge of the backer. Claim 2 adds that the overhang actually folds over "said edge." Claim 18 is similar to claim 2. Likewise, claims 6, 17 and 22 of the '493 patent recite that the overhang extends beyond an edge of the backer; claim 7 recites that the overhang folds over an edge. Figures 6-9 and 22 of the patents depict the liner panels' facer and backer, their geometric relationship to each other, and how the liner panels attach to the posts. They reveal what the patentee meant by "an edge of said backer." An edge is where the backer ends. Each backer, like any square or rectangular item, has four edges: top, bottom, left, and right. Each edge marks the point at which the item (here, the backer) ends.[2] Thus the patents describe where the overhang portion resides by reference to the end of the backer panel.

Stoughton's straightforward proposed construction captures the way the patents use the term "edge." Great Dane's, by contrast, seeks to leave itself a wide berth so that it may ensnare other configurations not disclosed by the patents. By defining "edge" as "a boundary where *a thing* begins or ends," Great Dane moves far afield from the patents' context. Notably, Great Dane relies on no evidence from the patents' specification, figures, or claims. Instead, it turns solely to a dictionary – which is wholly unnecessary given the clear definition provided by the patents themselves. Great Dane hopes to expand the scope of its claims by suggesting that "edge" can refer to the boundary of a "thing" (such as an "area") as opposed to a specific item. Nothing in the patents supports this proposition. Great Dane's proposed definition suggests that a panel could be subdivided into separate "areas" (for example, by adding grooves or other

---

[2] Whether one calls the edge an "end" or a "beginning" is purely semantic and does not affect the scope of the patents.

7

demarcations) and infringe if the facer extended beyond an "edge" defining one of these areas – even if the facer did not ultimately extend beyond the end of the backer panel itself. This position strains credulity in light of the patents' disclosure.

An edge of the backer, as used in the '493 and '018 patents, is simply an end of the backer.

### C. Edge Surface

In addition to identifying "an edge," certain asserted claims in the patents recite an "edge surface." Based on the figures and the specification, this edge surface is the vertical surface at the end of the backer panel. It can and should be defined with reference only to the backer panel itself – Great Dane's proposed construction is unduly complicated and unclear. Shown below is Figure 7 with the edge surface noted in red:



As shown, the edge surface is the vertical surface at the end of the backer 36. In this particular configuration, the overhang portion of the facer 35b is shown folding over the edge and covering the edge surface, as well as part of the opposite side of the backer. *See, e.g.,* '493 patent, Fig. 7.

The "edge surface" is a simple, rather uncomplicated limitation in the asserted claims. Great Dane's proposed construction, however, muddies the water because it is a convoluted, wordy definition. Stoughton's proposed construction keeps the construction both simple and consistent with the patents' specification and claim language.

### D. Vertical Edge

As noted above, a backer panel will have four different edges – two horizontal, and two vertical. A horizontal and vertical edge will meet at each corner of the backer. Claim 12 of the '493 patent specifically recites a "vertical edge of said backer panel." Keeping in mind both the specification and figures of the patents, discussed above, and common knowledge regarding vertical and horizontal planes, the term "vertical edge" should be construed as the boundary formed where the vertical and horizontal surfaces of the backer meet. *See, e.g.,* Figs. 6-9.

### E. Covers

Claims 2, 18, and 23 of the '018 patent, and claim 7 of the '493 patent, recite that a portion of the panel's facer "covers" a portion of the backer. Stoughton contends that this term should be given its plain, ordinary meaning, *i.e.,* "overlay or lie over." Great Dane, on the other hand, offers the definition "completely overlays." The parties disagree about Great Dane's addition of the word "completely."

The intrinsic evidence supports Stoughton's definition. The patent uses both "entirely" and "at least a portion" to modify covers when such modification is necessary. For example, in Col. 6, lines 26-27, the patent states that "the steel sheet *may entirely cover* both sides of the backer." (Emphasis added.) In claim 4, the patent states that "said facer *covers at least a portion* of the side of said backer opposite said inward side." (Emphasis added.) In this context, defining "covers" as "completely overlays" makes no sense. If Great Dane's definition were

9

accepted, then both of those locutions would be erroneous—in the first instance "entirely" would be redundant, in the second "covers at least a portion" would be internally inconsistent.

Moreover, Great Dane's reliance on the cited dictionary definition is misplaced. Great Dane cites to a definition that applies to a noun ("***something*** that is placed over or about another thing," though the claim term is clearly a verb ("said overhang portion . . . covers an edge surface . . . ). Moreover, its own cited definition does not expressly or impliedly include the concept of "completely." The plain meaning of "covers" as a verb is simply to overlay or lie over. Great Dane agrees that "overlays" is a proper part of the definition, but erroneously adds the word "completely." There is no support in either the intrinsic or extrinsic evidence to support Great Dane's proposed construction.

The terms "covers" also appears – in a slightly different context – in claim 23 of the '018 patent: "Said plurality of liner panels include a plurality of discrete said backers sharing a common said facer, so that said common facer ***covers*** said vertical posts." Although both sides agree that this phrase requires that one facer overlays more than one backer, the parties disagree about other aspects of the recited language. Stoughton contends that the term means "a single metal facer covers all the posts such that the facer extends the entire length of the side wall inner surface and covers more than one backer," while Great Dane proffers the following definition: "multiple liner panels in which each liner panel has more than one backer sharing a single facer, arranged so that the facer completely overlays more than one vertical post." The difference is that under Stoughton's construction, all of the plurality of discrete backers share a single common facer, which overlays each post; under Great Dane's, by contrast, the "common facer" only need cover "more than one" post. The parties also disagree in that Great Dane repeats its erroneous construction of "covers" to mean "***completely*** overlays."

10

Stoughton's definition tracks the plain language of the claim and the description in the specification. Claim 23 is a dependent claim that depends ultimately from Claim 1.[3] The relevant portion of Claim 1 recites:

> A sidewall extending vertically upward from a longitudinal side of said floor, said sidewall including an exterior surface, and
>
> A liner panel inward of and spaced apart from said exterior surface, **said liner panel** including a **stiff backer** and **tough facer** so that **said facer** at least partially defines a planar inner surface of said side wall…

Claim 23 then recites a plurality of liner panels that "**include a plurality of discrete said backers sharing a common said facer**, so that **said common facer covers said vertical posts**." Tracing "said facer" and "said backers" to their antecedents in Claim 1, it becomes apparent that Claim 23 describes a sidewall which contains liner panels with discrete backers, but with one common facer. Because the facer is described as covering "said vertical posts," and the antecedent is the entirety of vertical posts in the trailer, one facer must cover all "said posts."

This is also consistent with the description in the specification. For example, Figure 22 illustrates an embodiment in which "the backers share a common facer so that the facer passes over the front surface of all vertical posts in the side wall." Col. 8, lines 9-20; Fig. 22.

Great Dane's construction would read out the requirement that "said common facer" covers "said vertical posts." Great Dane's construction would be partially supported if the claim recited "said common facer covering [a plurality of] said vertical posts." Because the claim requires the covering of "*said* vertical posts," however, there is no room for posts which are not covered by the common facer.

---

[3] Claim 23 also depends from Claims 14, 15, and 16.

11

### F. Recesses

Several claims in the '493 patent include limitations that recite structures which allow the liner panels to be attached to the posts with countersunk fasteners. The parties disagree about the proper definition of these limitations, which include terms such as "area depressed" and "recess". The specific language in dispute is set forth below:

Claim 16: The cargo transport structure as in claim 15, wherein

said ***backer defines an area depressed from said inward side of said backer***;
said ***facer deflects into said area so that said facer and said backer define a recess*** at said inner surface; and
said shaft portion extends through said backer and said facer so that said head portion is ***received in said recess*** and abuts said facer.

Claim 17: A cargo transport structure . . . said structure comprising . . .

A fastener extending through said facer and sand backer proximate said edge and into said post so that said fastener secures said liner panel to said post, said fastener having a shaft portion and a head portion that is wider than said shaft portion, wherein
said ***backer defines an area depressed from said inward side of said backer***,
said ***facer deflects into said area so that said facer and said backer define a recess*** at said inner surface, and
said shaft portion extends through said backer and said facer so that ***said head portion is received in said recess*** and abuts said facer.

Claim 23: The cargo transport structure as in claim 22, wherein said backer and said facer ***define a recess*** at said inner surface at which said shaft portion extends through said backer and said facer so that said head portion is ***received in said recess***.

Claim 25: The cargo transport structure as in claim 24, wherein

Said ***backer defines an area depressed from said inward side of said backer***, and
Said ***facer deflects into said area so that said facer and said backer define said recess***.

Additionally, claim 19 includes the limitations "said recesses," and claim 24 includes "said recess" and "recesses," which should all be interpreted consistent with the construction of claims 16, 17, 23, and 25.

The crux of the parties' dispute is whether the claimed recess is formed before the facer and backer are fastened to the post. Defendant believes the claim language and the specification establish that the recess must, indeed, be pre-formed. Plaintiff's proposed constructions would allow any incidental indentation formed as a result of the fastening process to fall within the definitions of "area depressed" and "recess." Plaintiff's position fails to take into account the inventor's own description of the invention in both words and figures.

First, the claim's use of several different active verbs makes clear that the recesses must exist before the fasteners are inserted. The backer "defines" a depressed area. The backer and facer together "define" a recess. The recess, in turn, "receive[s]" the head portion of the fastener. If the inventor meant to claim a nominal indentation formed as an incidental result of the fastening process, the fastener would define the indentation – not the backer and facer. Moreover, the indentation would not "receive" the head portion if it were in fact formed by the action of that head portion. The claims recite that the fastener's head portion is "received in" the recess – which requires the recess to exist before the head portion is placed there. *See* Col. 11, line 65 – Col. 12, line 38; Col. 13, lines 8-11; Col. 14, lines 5-10.

The specification confirms the plain meaning of the claim language. The specification states that "the heads of fasteners 34a and 34b . . . could also be countersunk into recesses formed in both facer 35 and backer 36 of liner panels 33 so that the heads are at or below the panel surfaces, as shown in Fig. 8." '493 patent, Col. 8, lines 32-37. A fastener may not be countersunk "into" a space unless that space – here, a "recess" – already exists. Additionally, the specification provides that the claimed recesses may be formed by "crushing, cutting, milling, drilling or sanding" the backer and/or the facer. They are not formed by the fastening process itself.

Moreover, "the entire length of the panel's vertical edges may be recessed by similar means so that other components, such as attaching fasteners or clamp strips . . . may be mounted flush with the main surface of sheet 35, thereby maintaining a smooth surface on walls 30 and 31." Col. 8, lines 41-46. This plainly contemplates manufacturing recesses the prior to fastening. Otherwise, entire vertical edges could not be recessed.

The specification also notes that in the preferred embodiment, "the recesses or recess line" are formed by die cut *after* the backer and facer are attached to each other. This attachment necessarily happens before the liner panel (comprised of the attached backer and facer) is fastened to the post.

Finally, Figure 8 depicts the recess (item 38) formed by the depressed area of the backer (36), into which the facer (35) has deflected. It further depicts a fastener (34) with its head countersunk in the recess.



FIG. 8

The recess (38) is not merely a result of the fastening process. It has a pre-defined shape with angled sides.

Accordingly, Stoughton's proposed construction, which includes the requirement that the recesses be pre-formed, prior to the fastening of the liner panel to the post, is correct.

14

### G. Flanges

Stoughton is not quite clear what the parties dispute concerning the term "flange" or "stepped-down flanges." Both parties rely on the same dictionary definition, which is "a rib or rim…for attachment." Because the term is likely unfamiliar to jurors, Stoughton believes clarification of the term using a dictionary definition is appropriate.

Stoughton's proposed interpretation is that: "The flanges which are arranged in steps are ribs or rims that extend the length of the post, away from the front face of the post, and form a structure, such as a recess for the attachment of the liner panels." This adds the undisputed dictionary definition to the claim language of "*Defines stepped-down flanges on opposite sides of a front face of said post that receive vertical sides of respective said adjacent liner panels,*" and allows the jury to understand the jargon of the claim.

It is entirely consistent with the specification and figures of the patent, which show exactly that "panel 33a fastens to post 50 at the recess formed by stepped down flange 54a. The panel is fastened to the flange by multiple fasteners 34a along the panel's length. Similarly, an adjacent panel 33b is fastened by multiple fasteners to the post at the recess form by stepped down flange 54b."



FIG. 7

### H. Adjacent

Claims 13, 14, and 21 of the '493 patent[4] recite "adjacent liner panels." The parties disagree about the proper construction of this term. In particular, they disagree about the meaning of "adjacent" in the context of the patents in suit. Stoughton contends that the proper construction is "next to." Great Dane's proposed construction is "close to or nearby." The intrinsic evidence, including the claim language itself, supports Stoughton's construction.

In general, the wall of the claimed cargo transport structure is formed of multiple liner panels, which attach to posts. *See* '018 patent, Col. 5, lines 26-29; Figs. 6 and 7. According to the claims of the '018 and '493 patent, these panels are adjacent. Figures 6 and 7 demonstrate that the panels can be attached to the posts such that they abut each other, or such that they abut the post. In either configuration, the panels are next to each other. No structure other than a post (*i.e.,* no other panels) comes between the pairs of adjacent liner panels. As such, the panels are "next to" each other, meaning that no structure of the same kind comes between them. In the same way, two houses will be adjacent, *i.e.,* next to each other, even though lawn and driveway are disposed between them.

Stoughton does not contend that the liner panels must abut each other to be adjacent; indeed, that would contradict normal rules of construction, because some claims of the patents-in-suit recite adjacent liner panels that abut each other. *See, e.g.,* '493 patent, Claim 2. Plainly, then, adjacent panels need not touch (although abutting liner panels would certainly also be adjacent). They do, however, need to be next to each other such that nothing other than a post is disposed between them.

---

[4] The parties' joint claim construction chart only includes claims 13 and 21 of the '493 patent; however, this term should be construed in the same way for all asserted claims in which it appears in both the '493 and '018 patents.

16

This construction is consistent with the patents' claim language. For example, claim 1 of the '493 patent recites, "a plurality of adjacent liner panels," "a plurality of elongated vertical posts," and further provides that "each pair of adjacent said liner panels is attached to a respective said vertical post disposed between said adjacent liner panels . . . ." '493 patent, Col. 10, lines 2, 11, 15-20. Thus the patent clearly identifies panels as "adjacent" even if a post is disposed between them.

Great Dane's proposed construction is overbroad in that it only requires the adjacent panels to be close to each other, or nearby each other. This would expand the scope of the claims to include configurations in which multiple structures come between the liner panels. Moreover, the proposed construction is vague because it injects far too much subjectivity into the claim interpretation process. At what point is the distance between two panels too much to be considered "close" or "near?" Indeed, liner panels on opposite sides of a trailer could be considered close to or nearby each other. They could not, however, be considered next to each other.

The very dictionary entry for "adjacent," a portion of which Great Dane cites in support of its construction, confirms Stoughton's proposed construction. Merriam-Webster's Collegiate Dictionary notes that "ADJACENT may or may not imply contact but always implies absence of anything of the same kind in between." (*See* Ex. A attached hereto) Stoughton's proposed construction of "next to" is consistent with that statement, but Great Dane's is not.

## *CONCLUSION*

Based on the foregoing, Defendant Stoughton Trailers, LLC respectfully requests that this Court adopt the claim constructions proffered by Stoughton, as set forth above and in the parties' Joint Claim Construction Chart.

Dated this 25th day of September, 2009

        **HALL, BOOTH, SMITH & SLOVER, P.C.**

        By:  s/ Shaun Daugherty
          Shaun Daugherty, Esq.
           Ga. Bar No. 205877
           1180 West Peachtree NW
           Atlantic Center Plaza, Suite 900
           Atlanta, GA 30309
           Phone: (404) 954-5000
           Fax:  (678) 539-1568
           SDaugherty@hbss.net


        **MICHAEL BEST & FRIEDRICH LLP**

        By:  /s Jonathan H. Margolies
          Jonathan H. Margolies, SBN 1000452
          Katherine W. Schill, SBN 1025887
          100 East Wisconsin Avenue, Suite 3300
          Milwaukee, WI 53202-4108
          Phone: (414) 271-6560
          Fax:  (414) 277-0656
          jhmargolies@michaelbest.com
          kwschill@michaelbest.com

        Attorneys for Defendant
        Stoughton Trailers, LLC