# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

GREAT DANE LIMITED                )
PARTNERSHIP,                      )
                                  )
    Plaintiff,            )
                                  )
v.                                )    Civil Case Number 3:08-cv-89
                                  )
STOUGHTON TRAILERS, LLC and )
NEWCOURT, INC.,                   )
                                  )
    Defendants.           )

## PLAINTIFF GREAT DANE LIMITED PARTNERSHIP'S
## <u>OPENING CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................... 1

    A. The Patents-in-Suit ...................................................................................... 1

    B. Claims Identified for Construction .............................................................. 2

II. LEGAL STANDARDS FOR CLAIM CONSTRUCTION ............................................. 2

    A. Intrinsic Evidence Is the Most Important Evidence for Claim Construction ............. 3

    B. The Preferred Embodiment Does Not Limit the Scope of the Claims ...................... 4

    C. Patent Claims Should Be Given Their Plain and Ordinary Meanings ....................... 6

    D. Extrinsic Evidence Also May Be Considered During Claim Construction ................ 7

III. AGREED-UPON CLAIM CONSTRUCTIONS ............................................................ 8

IV. ANALYSIS OF DISPUTED CLAIM TERMS ............................................................. 9

    A. Recess or Area Depressed ............................................................................ 9

    B. Received ................................................................................................... 18

    C. Overhang Portion ..................................................................................... 22

    D. Edge ....................................................................................................... 25

    E. Covers ..................................................................................................... 30

    F. Stepped-Down Flanges .............................................................................. 32

    G. Adjacent ................................................................................................. 34

    H. Defendants' Definition of Overhang, Edge, and Stepped-Down Flange are Directed to Issues Not Properly Before the Court ................................ 36

V. CONCLUSION ....................................................................................................... 38

## TABLE OF AUTHORITIES

**Cases**

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007) ............................. 17

*Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718 (Fed. Cir. 2002) ................................... 4, 15, 21

*Brookhill-Wilk 1, L.L.C., v. Intuitive Surgical, Inc.*, 326 F.3d 1215 (Fed. Cir. 2003) ............. 7, 31

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334 (Fed. Cir. 1999) ............................. 2

*C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004) ........................................ 8

*Curtiss-Wright Flow Control Corp. v. Z7J Techs. GmbH*, 563 F. Supp. 2d 1109 (C.D. Cal. 2007) ................................................................................................................ 8

*Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048 (Fed. Cir. 1994) ....... 5, 16, 24

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, C03-01431SBA (EDL), 2005 WL 2043047 (N.D. Cal., Aug. 24 2005) .......................................................................... 37

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir 2004) ..... 7

*Input/Output, Inc. v. Sercel, Inc.*, No. 5:06-CV-236, 2007 WL 6196070 (E.D. Tex., Dec. 19, 2007) ........................................................................................... 33

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ............ passim

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050 (Fed. Cir. 1989) ................................... 6

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999) ............... passim

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968 (Fed. Cir. 1999) ............................. 6

*Laitram Corp. v. NEC Corp.*, 163 F.3d 1342 (Fed. Cir. 1998) ................................................... 6

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ........................................................................................... 2, 3, 7

*McKesson Info. Solutions LLC v. Epic Sys. Corp.*, 495 F.Supp. 2d 1329 (N.D. Ga. 2007) ......... 37

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1332 (2006) ................................................................................................ passim

*Raines v. Byrd*, 521 U.S. 811 (1997) ................................................................................... 37, 38

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ......................... 7

BDDB01 5840562v1

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) .................................................. 5

*Sorkin v. Amsysco, Inc.*, No. H-04-4182, 2006 WL 6143147 (S.D. Tex., Feb. 27, 2006) ........... 33

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107 (Fed. Cir. 1985) (en banc) ............. 4, 5

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370 (Fed. Cir. 2000) .................. 16

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ................................... 3, 4, 7

**<u>Statutes</u>**

35 U.S.C. § 112 ......................................................................................................................... 3, 4

Pursuant to Local Patent Rule 6.5, Plaintiff, Great Dane Limited Partnership ("Great Dane"), submits its Opening Claim Construction Brief.

## I.    INTRODUCTION

Great Dane alleges that Defendants Stoughton Trailers, LLC ("Stoughton") and Newcourt, Inc. ("Newcourt") (collectively "Defendants") infringe U.S. Patent No. 6,652,018 ("the '018 Patent")[1] and U.S. Patent No. 6,923,493 ("the '493 Patent")[2] (collectively "the Patents-in-Suit").

## A.    The Patents-in-Suit

The Patents-in-Suit relate to improvements in the design of a cargo trailer.[3]  In general, the cargo trailer claimed in the Patents-in-Suit is comprised of a floor (20), a roof (40), side walls (30 / 31), at least one vertical support post (51), and interior liner panels (33).[4]  The interior liner panels are attached to the vertical posts and include a backer comprised of a *stiff* material and a facer comprised of a *tough* material.[5]



Fig. 2 of the Patents-in-Suit

---

[1] A copy of the '018 Patent is attached hereto as Exhibit A.
[2] A copy of the '493 Patent is attached hereto as Exhibit B.
[3] Ex. A, '018 Patent, abstract; '493 Patent, abstract; '018 Patent Col. 3, ll. 35-40; '018 Patent Fig. 2
[4] *Id.*
[5] *Id.*

1

B.    Claims Identified for Construction

Through compliance with procedures outlined in Local Patent Rules 6.1-6.3, twenty-eight (28) claim terms or phrases have been identified that one or more of the parties believe require construction.  Of these twenty-eight (28) terms or phrases, the parties have a dispute as to the proper construction of twenty-seven (27).  While a relatively large number of claims are still in dispute, Great Dane believes the parties' disputes ultimately turn on the proper construction of seven key terms or phases: (1) *recess* or *area depressed*, (2) *received*, (3) *overhang portion*, (4) *vertical edge*, (5) *covers*, (6) *stepped-down flange*, and (7) *adjacent*.

## II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim construction is the process through which the Court, guided by well-established rules, defines, or construes, identified terms or phrases within claims of a patent.[6]  This process is critical to the resolution of nearly every issue raised in a patent infringement suit, as the claims define the extent of a patent's coverage.[7]  Said another way, the claims, similar to the language in a deed for real property, set out the "metes and bounds" of the intellectual property protected by the patent.[8]  It is the Court's duty to clarify the boundaries indentified in the claims

---

[6] *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1332 (2006); *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)

[7] *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999)

[8] *Id.*

by defining key, disputed terms.[9]  To reach a proper definition, the Court must examine the language of the claim in the context of the language used in the specification (a written description of what the inventor believes to be the preferred means of making and using the invention).[10]  The Court must also consider the patent's administrative record in the U.S. Patent & Trademark Office, often referred to as the prosecution or file history.[11]  This evidence is collectively referred to as the intrinsic evidence, and may, on its own, be sufficient to reach a proper definition.[12]  However, if additional guidance is required, the Court may look to extrinsic evidence, such as dictionaries.[13]

A.    Intrinsic Evidence Is the Most Important Evidence for Claim Construction

To ascertain the meaning of claims, a court begins by looking to three primary sources of intrinsic evidence:  the claims, the written description in the specification, and the prosecution history.[14]  While the claims define the scope of the invention, the written description in the specification offers helpful guidance as to the claims' meaning, as the specification must "describe the claimed invention in

---

[9] *Markman*, 52 F.3d at 979-80.
[10] *Id*. at 979-80; 35 U.S.C. § 112
[11] *Markman*, 52 F.3d at 979-80
[12] *Id*.
[13] *Id* at 980.
[14] *Markman*, 52 F.3d at 979; *see also Phillips*, 415 F.3d at 1314; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

'full, clear, concise, and exact terms.'"[15]  Therefore, "the specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"[16]

B.      The Preferred Embodiment Does Not Limit the Scope of the Claims

While the specification offers guidance as to the meaning of the claims, the Court must be cautious not to limit the scope of the claim with language from the specification's written description.  The dichotomy between the claims and the specification's written description forms the foundation of one of the principal canons of claim construction—namely, that limitations of the preferred embodiments disclosed in the specification do not limit the claims.[17]  Otherwise, as the Federal Circuit explained in one of its first *en banc* decisions, the claims would be superfluous:

> [T]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims.  If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims . . . .  It is the <u>claims</u> that measure the invention.[18]

---

[15] *Phillips*, 415 F.3d at 1316 (quoting 35 U.S.C. § 112, ¶ 1).

[16] *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).

[17] *See Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 723–24 (Fed. Cir. 2002); *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

[18] *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) (internal citations omitted) (emphasis added).

The Federal Circuit consistently has made clear that, "although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments."[19]  The Federal Circuit succinctly stated this bedrock claim construction principle as, "'Specifications teach.  Claims claim.'"[20]

The written description contained in specification of the Patents-in-Suit is explicitly that of a *preferred*, not exclusive, embodiment.  Indeed, the Patents-in-Suit expressly state that the preferred embodiments are merely illustrative examples, and are intended to explain, not limit, the claims.[21]

> Each example is provided by way of explanation of the invention, not limitation of the invention.  In fact, it will be apparent to those skilled in the art that modifications and variations can be made in the present invention without departing from the scope or spirit thereof.[22]

The Defendants' proposed definitions repeatedly attempt to read into the claim limitations, the preferred embodiments of the Patents-in-Suit.  In so doing, the Defendants disregard well-settled precedent set by the Federal Circuit, which has "consistently adhered to the proposition that courts cannot alter what the

---

[19] *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1054 (Fed. Cir. 1994); *see also Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989–92 (Fed. Cir. 1999); *Interactive Gift,* 256 F.3d at 1340.

[20] *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) (quoting *SRI Int'l*, 775 F.2d at 1121 n.14).

[21] Ex. A, 018' Patent, col. 3, ll. 24-29; Ex. B, '490 Patent, col. 3, ll. 27-32.

[22] *Id.*

patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is <u>meant</u> by a word <u>in</u> a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'"[23]

C.     Patent Claims Should Be Given Their Plain and Ordinary Meanings

When a court examines the words of a claim, it should do so with a predisposition toward interpreting those words consistently with their plain and ordinary meanings.[24] "In short, a court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms."[25] "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question" after reading the term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[26]

The Defendants bear a heavy burden to prove that claim terms in the Patents-in-Suit do not have their plain and ordinary meanings.[27] A party advancing a construction different from the plain meaning can overcome this "heavy

[23] *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998) (quoting *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989)).
[24] *Phillips*, 415 F.3d at 1312.
[25] *Johnson Worldwide*, 175 F.3d at 989; *see also Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973 (Fed. Cir. 1999).
[26] *Phillips*, 415 F.3d at 1313.
[27] *See Johnson Worldwide*, 175 F.3d at 989.

presumption" only in two exceptional circumstances.[28]  The first circumstance is

when the words "chosen by the patentee so deprive the claim of clarity that there is

no means by which the scope of the claim may be ascertained from the language

used."[29]  The second is when the patentee acts as his own lexicographer by clearly

setting forth a non-ordinary definition of a claim term.[30]  "Absent an express intent

to impart a novel meaning, 'terms in a claim are to be given their ordinary and

accustomed meaning.'"[31]

D.     Extrinsic Evidence Also May Be Considered During Claim
          Construction

In some cases, the intrinsic evidence does not adequately provide a

meaning for claim terms.[32]  In such instances, Courts may examine "'extrinsic

evidence concerning relevant scientific principles, the meaning of technical terms,

and the state of the art.'" [33]  Extrinsic evidence "consists of all evidence external to

the patent and prosecution history, including expert and inventor testimony,

dictionaries, and learned treatises."[34]  While "'less significant than the intrinsic

---

[28] *Id.*

[29] *Id.* at 990.

[30] *See Brookhill-Wilk 1, L.L.C., v. Intuitive Surgical, Inc.*, 326 F.3d 1215, 1220 (Fed. Cir. 2003).

[31] *Id.*, quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

[32] *See, e.g.*, *Vitronics*, 90 F.3d at 1584 (stating that where the "intrinsic evidence is insufficient to enable the court to determine the meaning of the asserted claims . . . extrinsic evidence . . . may also properly be relied on to understand the technology and to construe the claims.").

[33] *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir 2004)).

[34] *Markman*, 52 F.3d at 980; *see also Vitronics*, 90 F.3d at 1583–85; *Phillips*, 415 F.3d at 1317–19.

record in determining the legally operative meaning of claim language,'" extrinsic evidence can be useful in the process of defining claim terms.[35]

Because dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources [are] among the many tools that can assist the court in determining the meaning of a particular technology to those of skill in the art of the invention."[36] Indeed, "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by [the Federal Circuit] and the Supreme Court in claim interpretation."[37] Any reliance on dictionaries, however, must comport with the intrinsic evidence.[38]

## III. AGREED-UPON CLAIM CONSTRUCTIONS

The Parties have agreed upon the construction of the following phrase:

Front Surface: (Claim 21 of the '018 Patent) – The post surface that is closest to the interior of the trailer.

Great Dane respectfully requests that the Court adopt this agreed-upon construction.

---

[35] *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)) (internal quotations omitted).
[36] *Id.* at 1318.
[37] *Id.* at 1322.
[38] *Curtiss-Wright Flow Control Corp. v. Z7J Techs. GmbH*, 563 F. Supp. 2d 1109, 1120-21 (C.D. Cal. 2007)(citing *Phillips,* 415 F.3d at 1319-20)).

# IV.   ANALYSIS OF DISPUTED CLAIM TERMS

The Parties have a dispute as to the proper construction of twenty-seven (27) terms or phrases used in the claims of the Patents-in-Suit.  Great Dane asserts, however, that all of the parties' disputes ultimately turn on the proper construction of seven key terms or phases: (1) *recess* or *area depressed*, (2) *received*, (3) *overhang*, (4) *edge*, (5) *covers*, (6) *stepped-down flange*, and (7) *adjacent*.

A.    Recess or Area Depressed

Fifteen (15) of the disputed terms or phrases incorporate the term *recess* or the phrase *area depressed*, or reference something deflecting into such an area.[39]  In the claims of the Patents-in-Suit, the *recess* or *area depressed* refers to an area of the liner panel at or around the head of a fastener.[40]  The underlying dispute regarding these terms or phrases is whether the claims require the *recess* or *area depressed* to be pre-formed prior to the time the panel is attached to the post, or whether the claims require the *recess* or *area depressed* be present, regardless of when and how they were created.

---

[39] Parties' Joint Claim Construction Statement Pursuant to Local Patent Rule 6.3 (Dkt. No. 38), Exhibit A pages 1-4.
[40] *See* Ex. B, '493 Patent, Col. 12, ll. 25-34

The following chart lists the disputed terms or phrases that include the *recess* or *area depressed* issue, along with the parties proposed definitions:

| Disputed Term or Phrase | Great Dane's Definition | Defendants' Definition |
|---|---|---|
| *Area depressed*<br><br>'493 Patent - claims 16, 17, and 25 | an area recessed from the nearby area | a recess pre-formed in the backer, prior to attachment of the panel to the post, away from the backer's inward side |
| *Deflects into said area*<br><br>'493 Patent – claims 16, 17, and 25 | extends into the area | the facer is indented into the backer's recess and, prior to attachment of the panel to the post, pre-forms a recess in the panel |
| *Define a recess*<br><br>'493 Patent – claims 16, 17, and 23 | an indentation | the facer is indented into the backer's recess and, prior to attachment of the panel to the post, pre-forms a recess in the panel. |
| *Define said recess*<br><br>'493 Patent – claim 25 | an indentation | the facer is indented into the backer's recess and, prior to attachment of the panel to the post, pre-forms a recess in the panel. |
| *Backer defines an area depressed from said inward side of said backer*<br><br>'493 Patent – claim 16 | an area of the backer that is recessed from the nearby surface of the backer that generally faces the interior of the trailer. | a recess pre-formed in the backer, prior to attachment of the panel to the post away from the backer's inward side |

| | | |
|---|---|---|
| *Facer deflects into said area so that said facer and said backer define a recess*<br><br>'493 Patent – claim 16 | an area of the facer that extends into an area depressed from the nearby surface of the backer, creating an indentation | the facer is identified into the backer's recess and, prior to attachment of the panel to the post, pre-forms a recess in the panel. |
| *Defines an area depressed from said inward side of said backer*<br><br>'493 Patent – claim 17 | an area of the backer that is recessed from the nearby surface of the backer that generally faces the interior of the trailer | a recess preformed in the backer, prior to attachment of the panel to the post, away from the backer's inward side |
| *Define a recess at said inner surface*<br><br>'493 Patent – claim 17 | an indentation at the surface that generally faces the interior of the trailer | the facer is identified into the backer's recess and, prior to attachment of the panel to the post, pre-forms a recess in the panel |
| *Define a recess*<br><br>'493 Patent – claims 23 and 25 | an indentation | the facer and backer contain pre-formed recesses which accept the fastener |
| *Said recess*<br><br>'493 Patent – claim 24 | an indentation | the recess pre-formed in the facer and backer |
| *Recesses*<br><br>'493 Patent – claim 24 | multiple indentations | a plurality of recesses pre-founded in the face and backer |
| *Depressed from said inward side of said backer*<br><br>493 Patent – claim 25 | an area of the backer that is recessed from the nearby surface of the backer, generally facing the interior of the trailer | a recess pre-formed in the backer, prior to the attachment of the panel to the post, away from the backer's inward side |
| *Received in said recess*<br>'493 Patent – claims 16, 17, and 23 | received within an indentation | the pre-formed recess accepts the fastener such that the head resides below the inward surface of the panel. |

| | | |
|---|---|---|
| *Respective said recesses*<br><br>'493 Patent – claim 19 | indentations | the pre-formed recesses in the backer and facer that accept the fastener such that the head resides below the inward surface of the panel |
| *Is received in said recess and abuts said facer*<br><br>'493 Patent – claim 17 | received in an indentation and contacting the facer | the pre-formed recess accepts the fastener such that the head resides below the inward surface of the panel and contacts the facer |

1.   <u>Great Dane's Proposed Definition</u>

The intrinsic record dictates that *recess* or *area depressed* be defined as "an indentation."  First, all of the claims referencing these terms and phrases describe a *recess* or *area depressed* as "an indentation" in the backer and facer of the liner panel that receives the head of a fastener.[41]  For example, Claim 16 of the '493 Patent states that the "backer defines an *area depressed* from said inward side of said backer, said facer deflects into said area so that said facer and said backer define a *recess* at said inner surface…and said head portion is received in said *recess*."[42]  Second, the specification's written description describes the *recess* or *area depressed* as an indentation that receives the head of a fastener.[43]  "The head of fasteners, in this case screws, may extend out from [the liner panel]

[41] Ex. B, '493 Patent, claims 16, 17, 19, 23, 24, 25.
[42] Ex. B, '493 Patent, claim 16.
[43] Ex. A, '018 Patent Col. 8, ll. 33-51

surface…but could also be countersunk into recesses formed in both facer and backer of liner panels so that the heads are at or below the panel surfaces."[44]

The extrinsic evidence further supports a definition of *recess* or *area depressed* as "an indentation." The parties both reference Webster's Dictionary to support their positions regarding the *recess* and *area depressed* claims.[45] Interestingly, Defendants chose not to reference the noun *recess* or the adjective *depressed*, as used in the claims of the Patents-in-Suit, but instead reference the verb *depress*.[46] All of these definitions, however, support Great Dane's proposed construction of *recess* or *area depressed* as "an indentation." *Recess* is defined by Webster's Dictionary as an "indentation, cleft."[47] *Depressed* is defined as "having the central part lower than the margin."[48] Even the definition of the verb *depress* used by Defendants, "to cause to sink to a lower position," indicates that a *recess* or *depressed area* is an indentation.[49]

### 2. Defendants' Proposed Definition

Defendants take the position that the term *recess* does not require additional construction, as it is used in all of their definitions. Instead, they insist the claim be limited by a requirement that the *recess* or *area depressed* be pre-

---

[44] *Id.*
[45] Parties' Joint Claim Construction Statement Pursuant to Local Patent Rule 6.3 (Dkt. No. 38), Exhibit A pages 1-4.
[46] *Id.*
[47] Ex. C, Merriam-Websters' Collegiate Dictionary – 10th Ed.
[48] *Id.*
[49] *Id.*

formed prior to the time the liner panel is attached to the post.  The addition of such a unique and specific limitation is unsupported by the language of the claims, the specification's written description, or the extrinsic record.

To insert their unique pre-formed limitation , Defendants must overcome the "heavy presumption" that *recess* and *area depressed* have their plain and ordinary meanings.[50]  Defendants' identify two pieces of intrinsic evidence they contend support their assertion that the *recess* or *area depressed* be pre-formed prior to the time the liner panel is attached to the post.  First, they assert that the claim language of Claims 16, 17, 19, 23, 24 and 25 of the '493 Patent require the recess to be pre-formed.[51]  The language of these claims, as discussed above, makes no reference to the *recess* or *area depressed* being preformed prior to the time the panel is attached to the post.[52]  The language of the claims simply requires that the backer and facer of the liner panel have a *recess* or *depressed* area.[53]

The second item of intrinsic evidence cited by Defendants on this issue is a section of the specification's written description that describes various

---

[50] *See Johnson Worldwide*, 175 F.3d at 989.
[51] Parties' Joint Claim Construction Statement Pursuant to Local Patent Rule 6.3 (Dkt. No. 38), Exhibit A pages 1-4.
[52] Ex. B, '493 Patent, Claims 16, 17, and 25.
[53] *Id.*

methods by which the *recess* or *area depressed* **may** be formed.[54] "Each of a

plurality of recesses may be formed by crushing, cutting, milling, drilling or

sanding backer, or backer and facer together, such that the liner's thickness at

recess is reduced."[55] Subsequently, the specification describes **a** method for

creating a recess using a "die set."[56]

As an initial matter, nothing in this language necessitates that the

recess be pre-formed. While use of a die set to create a *recess* in one embodiment

may take place prior to attachment of the panel, "crushing," the first method

identified in the specification, could be achieved by the force the fastener head **at**

**the time the liner panel is attached to the post**.

More importantly, reading elements of an embodiment identified in

the specification's written description as additional limitations of a claim is clearly

improper. As the Federal Circuit has articulated on numerous occasions,

specifications are designed to describe the inventor's preferred embodiments, not

limit the scope of the invention.[57] "[A]lthough the specifications may well indicate

that certain embodiments are preferred, particular embodiments appearing in a

---

[54] Ex. A, '018 Patent Col. 8, ll. 33-51
[55] *Id.*
[56] *Id.*
[57] *See Beckson Marine,* 292 F.3d at 723–24; *Interactive Gift,* 256 F.3d at 1331.

specification will not be read into the claims when the claim language is broader than such embodiments."[58]

The extrinsic evidence further supports exclusion of Defendants' unique time limitation from the *recess* and *area depressed* definitions. As discussed above, all of the dictionary definitions referenced by the parties define *recess* and *area depressed* as an "indentation, cleft" and "having the central part lower than the margin." [59] Neither of these definitions make any reference to something being "pre-formed." Even the definition of the verb *depress* used by Defendants, "to cause to sink to a lower position," does not necessitate the *recess* or *depressed area* be pre-formed prior to the time the liner panel is attached to the post.[60]

In addition to being unsupported by both the intrinsic and extrinsic record, Defendants' proposed "pre-formed" limitation for *recess* is an improper attempt to convert an apparatus claim into a method claim. It is well-accepted that apparatus and method claims are distinct ways of claiming patentable inventions, with an apparatus claim identifying a novel product, regardless of the method in which it is created.[61] As such, Court's have been clear that, unless "the patentee

---

[58] *Electro Med.*, 34 F.3d at 1054; *see also Johnson Worldwide*, 175 F.3d at 989–92; *Interactive Gift*, 256 F.3d at 1340.
[59] Ex. C, Merriam-Websters' Collegiate Dictionary – 10th Ed.
[60] *Id.*
[61] *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000).

has made clear that the process steps are an *essential part* of the claimed invention," it is improper to limit an apparatus claim with method type restrictions.[62] Defendants proposed definition for *recess* posses precisely this problem. There can be no doubt that the Patents-in-Suit claim a particular cargo trailer (an apparatus), not a method for making a cargo trailer. And, Defendants have identified nothing to indicate the patentees made the process for making the *recess* an "essential part of the claimed invention."[63] Yet, Defendants attempt to restrict the definition of *recess* by adding a specific requirement that it be created using a particular method. Namely, that the *recess* be created before the panel is affixed to a support post. A restriction directed to the method in which the *recess* is manufactured, and not the *recess* itself, is an improper attempt to limit an apparatus claim with method restrictions, and cannot be accepted by the Court.

Defendants have failed to overcome the heavy presumption that the term *recess* should have its plain and ordinary meaning. In addition, their proposed pre-formed limitation is an improper attempt to insert a method limitation into an apparatus claim. As such, Great Dane requests that the Court reject Defendants' requirement that a *recess* or *area depressed* be pre-formed prior to the

---

[62] *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1375 (Fed. Cir. 2007).
[63] *Id.*

time the liner panel is attached to the post.  Instead, Great Dane requests that the Court define a *recess* or *area depressed* and an indentation.

B.    Received

In addition to the *recess* issue, three disputed claim phrases discussed above also recite or refer to a fastener being *received* in the recess.[64]  Below are the three claim phrases that contain or relate to the term *received*, with the parties proposed constructions.

| Disputed Phrase | Great Dane's Definition | Defendants' Definition |
|---|---|---|
| *Received in said recess* '493 Patent – claims 16, 17, and 23 | received within an indentation | the pre-formed recess accepts the fastener such that the head resides below the inward surface of the panel. |
| *Respective said recesses* '493 Patent – claim 19 | indentations | the pre-formed  recesses in the backer and facer that accept the fastener such that the head resides below the inward surface of the panel |
| *Is received in said recess and abuts said facer* '493 Patent – claim 17 | received in an indentation and contacting the facer | the pre-formed recess accepts the fastener such that the head resides below the inward surface of the panel |

1.    Great Dane's Proposed Definition

Great Dane believes that jurors will understand what it means for

---

[64] Parties' Joint Claim Construction Statement Pursuant to Local Patent Rule 6.3 (Dkt. No. 38), Exhibit A page 4.

something to be *received*, and that any attempt to provide further clarification will be unhelpful or add unfounded limitation to the claims. However, while Great Dane does not believe use of the phrase "accept the fastener," as used in portions of Defendants' definitions, offers additional clarification, it would not resist such an interpretation.

The claims at issue state that a "head portion is *received* in said recess."[65] This simple and direct language calls for no additional interpretation.

### 2. Defendants' Proposed Definition

The principal dispute is not whether *received* should be construed as "accepts" or "received," but instead whether the term *received* specifically requires the head of the fastener to "reside below the inward surface of the panel." This added requirement is yet another attempt by Defendants to read superfluous limitations into the claims.

The claims themselves state that the "head portion is *received* in said recess."[66] Nothing in this wording indicates that head must "reside below the inward side of the panel."

The specification's written description confirms that a fastener *received* in a recess need not "reside below the inward side of the panel."[67] For

---

[65] Ex. B, '493 Patent, Claim 16
[66] Ex. B, '493 Patent, Claim 16
[67] Ex. A, '018 Patent Col. 8, ll. 33-51

support of their position, Defendants cite to possible methods for attaching the panel with a fastener identified in the specification.[68] "The heads of the fasteners and, in this case, screws, **may extend out from this surface** as illustrated in Fig. 6 but could also be countersunk into recesses formed in both the facer and backer of liner panels **so that the heads are at or below the panel surfaces**."[69]

First, this language does not require that the head "resides below the surface of the panel." In fact, the portion of the written description referenced by Defendants envisions the head of the fastener residing in one of three possible positions: (1) extending out from; (2) at the surface of; or (3) below the surface of the panel.[70] As such, while this portion of the written description describes the fastener head residing below the surface of the panel as one possible option of an embodiment, it is certainly not identified as the only option.

This section of the specification is not the only portion of the specification that clearly states something *received* in a recess need not reside below the surface. Other sections of the specification discuss a "scuff band" being *received* in a recess.[71] In this section, the specification makes clear that "scuff

---

[68] Ex. A, '018 Patent Col. 8, ll. 33-51
[69] *Id* (emphasis added).
[70] *Id*.
[71] Ex. A, '018 Patent, Col. 4, l. 53- Col. 5, l. 12;

band" received in a recess does not need to reside below the surface of the liner panel.[72]

> When received by a recessed portion, at least a portion of the scuff band is disposed outward of post front face… [f]langes above the transition section may receive liner panels so that liner panels, post face and scuff band are coplanar…It should be understood that scuff band may not necessarily be coplanar with the inner side wall surface of the trailer.  For example, post portion may be recessed by approximately one-quarter inch but receive a half inch thick scuff band.  In this arrangement, only half of scuff band would be outward of the inner side wall. [73]

Again, the specification describes preferred embodiments where something is *received* in a recess and sits at, or out from, the surface of the liner panels.

Even if the specification didn't so plainly state that something *received* in a recess need not reside below the surface, reading elements of an embodiment identified in the specification's written description as additional limitations of a claim is clearly improper.[74]  As has previously been stated, specifications are designed to describe the inventor's preferred embodiments, not limit the scope of the invention.[75]

Because the Court and a jury will readily understand the meaning of

---

[72] *Id.*
[73] *Id.*
[74] *See Beckson Marine,* 292 F.3d at 723–24; *Interactive Gift*, 256 F.3d at 1331.
[75] *Id.*

the term *received*, and because Defendants cannot overcome the heavy

presumption that *received* is entitled to its ordinary meaning, Great Dane asks that

the Court decline to define the term *received*. However, in the event the Court

believes a definition is necessary, Great Dane asks that the Court define *received*

as "accepting the head of the fastener."

C.    <u>Overhang Portion</u>

Two of the disputed phrases turn on the construction of the phrase

*overhang portion*. Below are the two claim phrases referencing an *overhang*

*portion*, with the parties proposed definitions.

| Disputed Phrase | Great Dane's Definition | Defendants' Definition |
|---|---|---|
| *Defines an overhang portion that extends beyond an edge of said backer*<br><br>'018 Patent – claim 1 | a portion of the facer that extends beyond an edge of the backer | an overhang portion is a segment of the facer that is long enough to fold over the backer |
| *Overhang portion*<br><br>'018 Patent – claims 1, 2, 3, 18<br><br>'493 Patent – claims 6, 7, 8, 12, and 22 | a portion of the facer that extends beyond an edge of the backer | an overhang portion is a segment of the facer that is long enough to fold over the backer |

1.  <u>Great Dane's Proposed Definition</u>

Great Dane proposes that *overhang portion* receive its plain and

ordinary meaning, and be described as "a portion of the facer that extends beyond

an edge of the backer."  This straightforward definition is necessary to give full meaning to the numerous times this phrase is used in the claims of the Patents-in-Suit.

The Patents-in-Suit use the phrase *overhang portion* in more than eighteen different claims.[76]  Throughout these claims, the Patents-in-Suit describe an *overhang portion* that covers an edge, ends at an edge surface, wraps around an edge surface, folds away from an edge surface, folds out from an edge surface, folds away from an edge surface, etc…[77]  Most informative, however, is that the first time this phrase is used in a claim, claim 1 of the '018 Patent, the claim simply describes an *overhang portion*  that "extends beyond an edge of [the] backer."[78]  A definition of *overhang portion* that required more than "extending beyond an edge" would run counter to the patentees' clear choice to claim both specific variations of the facer overhang, as well as the more general claim of a facer longer, by no specific length, than the backer to which it is near.[79]

The extrinsic evidence further supports Great Dane's proposed definition.  Webster's Dictionary definition of *overhang* is "to project over," or "to

[76] Ex. A, '018 Patent, claims 2, 3, 4, 7, 18, 20, 22, 24, 29, 31, 32, 34, and 50; Ex. B, '493 Patent, claims 3, 7, 8, 9, 12.
[77] Ex. A, '018 Patent, claims 2, 3, 4, 7, 24, and 32.
[78] Ex. A, '018 Patent, claim 1.
[79] Ex. A, '018 Patent, claims 1, 2, 3, 4, 7, 24, and 32.

impend over."[80]  Both of these definitions are consistent with Great Dane's definition of overhang as "extends beyond an edge."

## 2. Defendants' Proposed Definition

Defendants have again tried improperly read language from the specification as limitations to the claim.  In so doing, Defendants' have proposed a definition that is at odds with the clear intent of the Patents-in-Suit.

Not surprising, Defendants support their more limited definition of *overhang portion* by referencing sections of the specification's written description that describe particular embodiments of the invention in which the *overhang portion* is long enough to fold over the backer.[81]

Again, the Federal Circuit has clearly stated that "although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments."[82]  Requiring an *overhang portion* to be long enough to fold over the backer improperly limits the scope of the claims, and runs directly counter to the patentees' clear intent to claim both specific configurations of the *overhang portion* that are long enough to fold over the backer, as well as the more general concept of a facer longer, by no specific

---

[80] Ex. C, Merriam-Websters' Collegiate Dictionary – 10th Ed.
[81] Ex. A, '018 Patent, Col. 6, ll. 12-27, Col. 7, ll. 5-12, Col. 7, ll. 21-28; '018 Patent, Figs. 6-9 and 17.
[82] *Electro Med.,* 34 F.3d at 1054; *see also Johnson Worldwide,* 175 F.3d at 989–92; *Interactive Gift,* 256 F.3d at 1340.

length, than the backer to which it is near.[83]

Because Defendants' definition runs counter to the intrinsic evidence, Great Dane requests that the Court reject Defendants' proposed definition and construe *overhang portion* to require a portion of the facer to extend beyond an edge of the backer.

D.    Edge

The parties have a dispute as to the proper construction of four phrases that refer to an *edge*.  Below are the four disputed phrases that reference an *edge*, with the parties proposed definitions.

| Disputed Term or Phrase | Great Dane's Definition | Defendants' Definition |
|---|---|---|
| *Edge*<br><br>'018 Patent – claims 1, 2 and 18<br><br>'493 Patent – claim 7 | a boundary where a thing begins or ends | the end of the backer panel |
| *Edge surface*<br><br>'018 Patent – claims 2, 3, and 18<br><br>'493 Patent – claims  7 and 12 | a surface where a thing on the backer begins or ends that is generally perpendicular to the inner surface of the trailer side wall | the vertical surface at the end of the backer panel |
| *Edge of said backer*<br><br>'493 Patent – claims 17 | a boundary where a thing on the backer begins or ends | the  end of the backer panel |

---

| | | |
|---|---|---|
| and 22 | | |
| *Vertical edge*<br><br>'493 Patent – claim 12 | a boundary where a surface of the backer begins or ends that is generally perpendicular to the ground on which the trailer is located | the boundary formed between the vertical and horizontal surfaces of backer |

   1.   <u>Great Dane's Proposed Definition</u>

The parties' primary dispute regarding the *edge* terms is whether the *edge*, or boundary, must be at the end of the liner panel.  Throughout the claims referencing the *edge* limitation, the term is always referenced as **an** *edge*, implying one of numerous edges, and is not referred to in a more limiting manner, such as **the** *edge*, implying one *edge* at the end of a liner panel.[84]

Figures 21and 22 of the Patents-in-Suit further clarify this issue, showing the envisioned possibility of backers with *edges* not at the end of the panel.[85]

---

[84] 'Ex. B, 493 Patent, claim 17.
[85] 'Ex. B, 493 Patent, claims 21 and 22.



**FIG. 21**



**FIG. 22**

In figure 21 the backer has an additional *edge* not at the end of the panel to accept a particular facer embodiment.[86] In figure 22 there is an additional *edge* not at the end of the panel to accept a particular embodiment of attachment to the vertical post.[87] In both cases, the *edge* is a place where something on the backer begins or ends, but not a place where the panel itself necessarily begins or ends.

---

[86] 'Ex. B, 498 Patent, figure 21
[87] 'Ex. B, 493 Patent, figure 22

In addition to their dispute regarding whether an *edge* must be at the end of an object, the parties dispute the *vertical* nature of the phrase *vertical edge*. Great Dane proposes *vertical edge* to be construed as "a boundary where a surface of the backer begins or ends that is generally perpendicular to the ground on which the trailer is located."[88]  This definition of *vertical edge* places it in context of "the ground on which the trailer is located," i.e. the horizontal surface.  Indeed, the *vertical* direction in the trailer will be dictated by whether the trailer is on a flat or inclined surface.  The language of the claim in which the phrase *vertical edge* is used, claim 12 of the '493 Patent, clearly contemplates using the floor as a reference point for vertical surfaces of the trailer.[89]  When referencing the side wall, of which the *vertical edge of said backer* is a part, the claim states that it "extend[s] vertically upward from a longitudinal edge of said floor."[90]

Great Dane's definition of *vertical edge* as being "generally perpendicular to the ground on which the trailer is located" is further supported by the extrinsic record. Webster's Dictionary defines vertical as being "perpendicular to the plane of the horizon or to a primary axis," and "located at right angles to the plane of a supporting surface."

---

[88] Parties' Joint Claim Construction Statement Pursuant to Local Patent Rule 6.3 (Dkt. No. 38), Exhibit A pages 6-8
[89] Ex. B, '493 Patent, claim 12
[90] *Id.*

## 2. Defendants' Proposed Definition

Defendants assert that an *edge* must be at the end of the panel. As discussed above, the intrinsic record envisions *edges* both at the end of the panel, as well as the possibility of *edges* at additional locations on the panel, such as those shown in figures 21 and 22 of the Patents-in-Suit.[91] As such, Defendants' proposed limitation that an *edge* exist only at the end of the panel is inconsistent with the intrinsic record, and must be rejected.

In addition, Defendants assert that the *vertical edge* is not, in fact, *vertical*, but is instead the boundary "between the vertical and horizontal surfaces."[92] There is no evidence that would support a construction of *vertical* as "between the vertical and horizontal surfaces." This definition not only deviates from the plain and ordinary meaning of *vertical*, it expressly excludes it. Despite the heavy presumption Defendants must overcome to deviate so strongly from the plain and ordinary meaning of *vertical*, Defendants have identified nothing in the claims, specification, or prosecution history that indicates *vertical* is not truly *vertical*, but instead the boundary between the *vertical* and horizontal. The only evidence Defendants reference in support of their position is figures 6-9 of the

---

[91] Ex. B, '493 Patent, figures 21 and 22.
[92] Parties' Joint Claim Construction Statement Pursuant to Local Patent Rule 6.3 (Dkt. No. 38), Exhibit A pages 6-8

Patents-in-Suit.[93]  Figures 6-9 are "partial cross-sectional view[s] of a side wall."[94]

As noted earlier, claim 12 of the '493 Patent states that this side-wall "extends

vertically."[95]  As such, the evidence cited by Defendants is an illustration of an

entirely vertical surface, making it impossible to understand how this supports a

construction of vertical edge that is "between the vertical and horizontal surfaces of

[the] backer."

Because Defendants have offered no evidence to support a

construction of vertical that deviates from its plain and ordinary meaning, let alone

expressly exclude it, Great Dane proposes that *vertical edge* be construed as "a

boundary where a surface on the backer begins or ends that is generally

perpendicular to the ground on which the trailer is located."

E.    Covers

While the parties are in agreement that the plain and ordinary meaning

of *covers* is to overlay, this construction, by itself, does not give full meaning to

the term as used in the Patents-in-Suit.  The parties proposed definitions for *covers*

are listed below.

| Disputed Term | Great Dane's Definition | Defendants' Definition |
|---|---|---|
| *Covers* | completely overlays | *overlay or lie over* |

[93] *Id.*
[94] Ex. A, '018 Patent Col. 2, ll. 34-46.
[95] Ex. B, '493 Patent, claim 12

| '018 Patent– claims 2, 18, and 23 | | |
|---|---|---|
| '493 Patent– claim 7 | | |

### 1. Great Dane's Definition

Great Dane's definition of *covers* as "completely overlays" is mandated by the intrinsic evidence. Both parties acknowledge this definition must include "overlay." However, failure to include the concept of complete coverage fails to give full meaning to the intrinsic record. Throughout the Patents-in-Suit, the inventors describe surfaces that are less than completely covered as "partially" covered.[96] By repeatedly clarifying that a surface that is less than fully covered is partially covered, the inventors have expressed an intent for the term *covers* to mean fully or completely covered.

The Federal Circuit has clearly stated that the patentee may act as his or her own lexicographer by clearly expressing an intent to impart a novel meaning on a term.[97] By stating that something that is less than fully covered is "partially" covered, the patentees have clearly expressed an intent for *covers* to mean fully or completely covered. As such, Great Dane proposes that covers be construed as "completely overlays."

---

[96] Ex. A, '018 Patent - Column 6, Lines 18-22; Column 7, Lines 13-20; '493 Patent, claim 3
[97] *See Brookhill-Wilk*, 326 F.3d at 1220.

## F.     Stepped-Down Flanges

Great-Dane believes that the phrase *stepped-down flanges* will not benefit from additional construction.  The three disputed phrases reciting or referring to *stepped-down flanges* are included below with Defendants' proposed definitions.

| Disputed Phrase | Great Dane's Definition | Defendants' Definition |
|---|---|---|
| *Defines stepped-down flanges on opposite sides of a front face of said post that receive vertical sides of respective said adjacent liner panels*<br><br>'018 Patent – claim 1, 19 | this phrase requires no construction | The flanges which are arranged in steps are ribs or rims that extend the length of the post, away from the front face of the post, and form a structure, such as a recess, for the attachment of the liner panels. |
| *Stepped-down flanges*<br><br>'493 Patent – claim 14 | this phrase requires no construction | the flanges which are arranged in steps are ribs or rims that extend the length of the post away from the front face of the post, and forma structure such as a recess for the attachment of the liner panels |
| *Said flanges*<br><br>'493 Patent – claim 14 | this phrase requires no construction | refers back to stepped-down flanges |

### 1.     Great Dane's Proposed Definition

The phrase *stepped-down flanges* is visually descriptive and can be

understood by the Court and potential jurors. Any attempt to further clarify this term only adds confusion and unnecessarily complicates issues. As such, Great Danes requests that the Court offer no additional construction for *stepped-down flanges*.

## 2. Defendants' Proposed Definition

The purpose of claim construction is to offer guidance as to the meaning of disputed terms.[98] Defendants' proposed definition, however, does nothing to offer guidance. Instead, Defendants proposed construction: "[t]he flanges which are arranged in steps are ribs or rims that extend the length of the post, away from the front face of the post, and form a structure, such as a recess, for the attachment of the liner panels," makes the visually descriptive phrase *stepped-down flanges* unintelligible. Defendants reference 5 illustrations and a section of the specification that simply uses the phrase *stepped-down flange* to identify this object in a particular embodiment.[99] Nothing in Defendants' references, nor any other evidence in the intrinsic or extrinsic record supports such an unmanageable construction. As such, Great Dane requests that the Court decline to accept Defendants definition.

---

[98] *Input/Output, Inc. v. Sercel, Inc.*, No. 5:06-CV-236, 2007 WL 6196070 at *10 (E.D. Tex., Dec. 19, 2007); *see also Sorkin v. Amsysco, Inc.*, No. H-04-4182, 2006 WL 6143147 at *2 (S.D. Tex., Feb. 27, 2006).
[99] Parties' Joint Claim Construction Statement Pursuant to Local Patent Rule 6.3 (Dkt. No. 38), Exhibit A pages 6-8.

G.  Adjacent

The final term in dispute is *adjacent*.  The parties proposed definitions

for the *adjacent* terms and phrases are listed below.

| Disputed Term or Phrase | Great Dane's Definition | Defendants' Definition |
|---|---|---|
| *Adjacent*<br><br>'493 Patent – claim 13 | close to or nearby | next to |
| *To a respective said vertical post between said adjacent liner panels*<br><br>'493 Patent – claim 21 | This phrase requires no construction | the panels are next to each other |

1.  Great Dane's Proposed Definition

Great Dane's definition of *adjacent* as "close to" or "nearby" implies,

similar to Defendants' use of "next to," a degree of proximity.   However, Great

Dane's proposed definition does not add a requirement that nothing be disposed

between two *adjacent* objects, unlike Defendants' use of "next to."  A definition

that describes closeness, but allows for the possibility of an object between two

*adjacent* items is required by the language of the claims.  In fact, the claim

language identified by Defendants as supporting their definition claims multiple

liner panels that are close, but may have an object between them.[100]   In these

claims, the patentees clearly describe a post placed **between** the *adjacent* liner

<hr>

[100] Ex. B, '493 Patent, claim 13; '493 Patent, claim 21.

panels.[101]

       As further support for Great Dane's definitions, figures 6 and 7 of the
Patents-in-Suit illustrate two embodiments with *adjacent* liner panels.  In Figure 6,
the liner panels are both "close" and "next to" each other.  However, in Figure 7 a
portion of a stepped-down flange is between the *adjacent* liner panels.  In this
embodiment, the panels are "close," but not "next to" each other.



**FIG. 6**

**FIG. 7**

       The extrinsic evidence further supports a definition of adjacent that
requires closeness, but does not require that nothing be disposed between objects;
Webster's Dictionary defines adjacent as "not distant: nearby."[102]

---

[101] *Id.*

[102] Ex. C, Merriam-Websters' Collegiate Dictionary – 10th Ed.

### 2. Defendants' Proposed Definition

Defendants' definition of "next to" goes beyond closeness, and requires that nothing be disposed between adjacent objects. As discussed above, this definition runs counter to the intrinsic record. Indeed, the very claims Defendants identify as supporting their definition describe a post placed **between** *adjacent* liner panels.[103] Such a configuration cannot require *adjacent* liner panels that are "next to" each other.

Because the intrinsic evidence clearly identifies *adjacent* liner panels that are "close to," but not necessarily "next to" each other, Great Dane asks that the Court reject Defendants' proposed definition and state that *adjacent* means "close to or nearby."

### H. Defendants' Definition of Overhang, Edge, and Stepped-Down Flange are Directed to Issues Not Properly Before the Court

In addition to being unsupported by the intrinsic record, Defendants' proposed definitions for *overhang*, *edge*, and *stepped-down flange* appear to be directed at disputes not currently before the Court. Defendants are not disputing infringement with respect to any of the *overhang*, *edge*, and *stepped-down flange*

---

[103] Ex. B, '493 Patent, claim 13; '493 Patent, claim 21.

claim limitations.[104]  As such, the only issue to be addressed with respect to these claim limitations is their validity.

There is an accepted "truism" in patent law: a definition that is more specific, as is proposed by Defendants, makes it easier to avoid infringement, but does nothing to assist Defendants with their validity arguments.[105]  Yet, for *overhang*, *edge*, and *stepped-down flange*, terms and phrases to which Defendants are making no infringement argument, Defendants have proposed more specific, restricting definitions.  The only explanation for advancing a more narrow definition in this situation is to create a claim limitation that is easier to design-around and avoid infringement with future products.  The local patent rules being used in this case  , however, are designed to identify the issues actually in dispute, ensuring the claim construction process is limited to those issues.[106]  Of greater importance, such an approach runs counter to the constitutional requirement that an actual controversy exist before the Court's authority can be invoked.[107]  "No principle is more fundamental to the judiciary's proper role in our system of

---

[104] *See* Ex. D, Defendant Stoughton Trailer LLC's Response to Plaintiff's Infringement Contentions.
[105] *See Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, C03-01431SBA (EDL), 2005 WL 2043047 at *2 (N.D. Cal., Aug. 24 2005).
[106] *See McKesson Info. Solutions LLC v. Epic Sys. Corp.*, 495 F.Supp. 2d 1329, 1335 (N.D. Ga. 2007).
[107] *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." [108]

Because Defendants' proposed definitions for *edge*, *overhang*, and *stepped-down flange* are directed toward issues not properly before the Court, as well as unsupported by the intrinsic record, Great Dane asks that they be rejected.

## V.    CONCLUSION

Defendants proposed definitions improperly limiting the scope of the claims at issue by construing the disputed terms and phrases to include details found in the specification of the Patents-in-Suit.  Great Dane asks that the Court reject this approach, and, unless a clear intent to the contrary is expressed in the Patents-in-Suit, give the disputed terms and phrases their plain and ordinary meaning.

Respectfully submitted,


 */s/ Brandon S. Judkins*
R. Trevor Carter
Brandon S. Judkins
BAKER & DANIELS LLP
300 North Meridian Street
Suite 2700
Indianapolis, IN  46204

---

[108] *Id.*

John M. Tatum
HUNTER, MACLEAN, EXLEY & DUNN
200 East St. Julian Street
Post Office Box 9848
Savannah, Georgia 31412

## **CERTIFICATE OF SERVICE**

This is to certify that on the 25th day of September, 2009, the foregoing document was electronically filed via the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Mark A. Barber
Shaun M. Daugherty
HALL, BOOTH, SMITH & SLOVER, P.C.
1180 West Peachtree NW
Atlantic Center Plaza, Suite 900
Atlanta, GA  30309

Sumner C. Rosenberg
Lawrence K. Nodine
J. Scott Anderson
Jeffrey H. Brickman
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
999 Peachtree Street, Suite 1000
Atlanta, GA  30309

Jonathan H. Margolies
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Avenue, Suite 3300
Milwaukee, WI  53202

*/s/ Brandon S. Judkins*
*Attorneys for Great Dane Limited*
*Partnership*