IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

GREAT DANE LIMITED PARTNERSHIP,    *

    Plaintiff,    *

vs.    *    CASE NO. 3:08-CV-89(CDL)

STOUGHTON TRAILERS, LLC and    *
NEWCOURT, INC.,
        *

    Defendants.

        *

O R D E R

    This is a patent infringement action. This matter is presently before the Court for construction of the disputed terms in U.S. Patent Nos. 6,652,018 ("'018 Patent") and 6,923,493 ("'493 Patent"). After considering the parties' arguments presented in their briefs and at a *Markman* hearing, the Court enters the following Order.

CLAIM CONSTRUCTION STANDARD

    A patent infringement analysis involves two steps: (1) "determining the meaning and scope of the patent claims asserted to be infringed" and (2) "comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The first step, at issue here, is a question of law for the Court. *Id.* at 979.

    "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water*

*Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Accordingly, "a claim construction analysis must begin and remain centered on the claim language itself." *Id.* at 1116. The words of a patent claim "are generally given their ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). Sometimes, the ordinary meaning of claim language "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words;" in such cases, "general purpose dictionaries may be helpful." *Id.* at 1314. In most cases, however, the court must examine terms "that have a particular meaning in a field of art," which is not always readily apparent. *Id.* In such cases, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova*, 381 F.3d at 1116). Such sources include "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (quoting *Innova*, 381 F.3d at 1116).

First, "the claims themselves provide substantial guidance as to the meaning of particular claim terms"—both the context in which the

term is used and the patent's other claims are useful for understanding a term's ordinary meaning. *Id.* Claim terms "are normally used consistently throughout the patent," so "the usage of a term in one claim can often illuminate the meaning of the same term in other claims," and "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.*

Second, the claims of a patent must not be read in isolation; they are "part of 'a fully integrated written instrument' consisting principally of a specification that concludes with the claims." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978) (internal citation omitted). Accordingly, the specification—which describes the manner and process of making and using the patented invention—"is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (internal quotation marks omitted). The specification "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316. The specification may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* Limitations from the specification are not,

however, to be read into the claims unless there is a "clear disavowal of claim scope." *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) (internal quotation marks omitted). In sum, "'[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Third, the court may consider the patent's prosecution history, which is "the complete record of the proceedings" before the Patent and Trademark Office ("PTO") and "includes the prior art cited during the examination of the patent." *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* Therefore, the prosecution history can "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* Unlike the specification, however, the "prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, [so] it often lacks the clarity of the specification." *Id.* Ambiguities in the prosecution history make it less relevant to claim construction. *Id.*

4

Finally, the court may consider extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art. *Phillips*, 415 F.3d at 1314. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Though extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted). In particular, "dictionaries, and especially technical dictionaries," are "recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Id.* at 1318. Such evidence may be considered if it is helpful in determining "the true meaning of language used in the patent claims." *Markman*, 52 F.3d at 980. However, for a number of reasons, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms" and "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1318-19. Nonetheless, a district court may, in its discretion, consider extrinsic evidence "because extrinsic evidence can help educate the court regarding the field of the invention and can help the court

determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. "In exercising that discretion, and in weighing all the evidence bearing on claim construction, the court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly." *Id.*

DISCUSSION

The patents at issue in this action relate to the design of a cargo trailer. Both the '018 Patent and the '493 Patent are entitled "Trailer with Side Wall Having Laminate Panel," and both patents are owned by Plaintiff. The cargo trailer claimed in the patents is comprised of a floor, a roof, side walls, vertical support posts, and interior liner panels. The parties' chief focus in this action is the interior liner panels, which are attached to the vertical posts and include a backer made of a "stiff" material that is bonded to a facer made of a "tough" material.

The parties identified 29 terms and phrases they believe require construction. The parties agree that the term "front surface" (claim 21 of the '018 Patent) means "The post surface that is closest to the interior of the trailer" (Joint Claim Constr. Statement 1). The Court adopts this meaning. As to the remaining 28 terms and phrases that are in dispute, the parties appear to agree that their disputes relate to the following key terms or phrases: (1) "covers," (2) "recess" or "area depressed," (3) "received," (4) "overhang" or "overhang portion," (5) "edge" or "vertical edge" or "edge surface,"

6

(6) "flange" or "stepped-down flange," and (7) "adjacent." After considering the evidence in the record, the briefs of the parties, and the argument of counsel, the Court adopts the following constructions.[1]

## 1.   "Covers"

The parties dispute the meaning of the term "covers" as it relates to a portion of the facer covering a portion of the backer, namely the *edge surface.* (Claims 2 and 18 of '018 Patent; claim 7 of '493 Patent.)  Specifically, the parties dispute whether "covers" means "completely overlays" as Plaintiff argues or "overlays" as Defendants assert.  As indicated by the parties in their proposed constructions, the only issue is whether the Court should include the word "completely" in its construction.

Plaintiff argues that the inventors describe surfaces that are less than completely covered as "partially" covered, so the inventors clearly expressed an intent for "covers" to mean completely covered. For example, in claim 3 of the '493 Patent, the overhang portion of the facer extends beyond the edge surface of the backer and wraps around the edge surface so that the facer "covers at least a portion" of the backer's opposite side.  Also, the specification of the '018 Patent states that the overhang portion is folded over and wrapped around the edges of the backer "so that it covers a perpendicular

_____

[1]For the convenience of the parties, the Court's constructions of disputed claim terms are summarized in a table at the end of this Order.

side edge of the backer and a *portion* of the backer's opposite side." ('018 Patent, col. 6:18-22 (emphasis added).) However, as Defendants point out, the inventors also described surfaces that are completely covered as "entirely cover[ed]." (*Id.* col. 6:25-27.)

The claims at issue do not limit the term "covers." The specification suggests that when the term "covers" is used with regard to the opposite side of the backer, it either means partially (*id.* col. 6:18-22) or entirely (*id.* col. 6:25-27). From this, the Court cannot conclude that the term "covers" necessarily means "completely covers." The Court therefore construes the term "covers" to mean "overlays" and declines to read the word "completely" into the term.

The parties also dispute the meaning of the term "covers" as used in claim 23 of the '018 Patent, which claims that "said plurality of liner panels include a plurality of discrete said backers sharing a common said facer, so that said common facer covers said vertical posts." (Claim 23 of '018 Patent.) In other words, claim 23 claims a trailer that has more than one liner panel, each of which includes a plurality of backers sharing a common facer so that the common facer covers the vertical posts to which the liner panels are attached. Plaintiff proposes the following construction: "multiple liner panels in which each liner panel has more than one backer sharing a single facer, arranged so that the facer completely overlays more than one vertical post." Defendants, on the other

hand, contend that the phrase means "a single metal facer covers all the posts such that the facer extends the entire length of the side wall inner surface and covers more than one backer."  The key dispute is whether (1) the common facer covers all the vertical posts on the side wall inner surface of the trailer, or (2) the common facer only covers "more than one" post.

Claim 23 of the '018 Patent is ultimately dependent on claim 1, and it is also dependent on claims 14, 15, and 16.  Claim 1 claims a trailer comprising:

> a plurality of wheels;
>
> a floor supported by said wheels; and
>
> a side wall extending vertically upward from a longitudinal side of said floor, said side wall including an exterior surface, and
>
> a liner panel inward of and spaced apart from said exterior surface, said liner panel including a stiff backer and a tough facer attached to an inward side of said backer so that said facer at least partially defines a planar inner surface of said side wall, wherein said facer defines an overhang portion that extends beyond an edge of said backer.

Claims 14, 15, and 16 recite the trailer as in claim 1 with "a plurality of spaced-apart" vertical posts extending up from the floor between the exterior surface and the liner panel and "a plurality of vertically-aligned" liner panels, each pair of which is attached to a vertical post between the adjacent liner panels.  Claim 23 recites that the plurality of liner panels "include a plurality of discrete

said backers sharing a common said facer, so that said common facer covers said vertical posts."

Defendants argue that claim 23 claims a single common facer for each side wall because claim 23 recites one common facer that covers "said vertical posts"—which Defendants contend refers to the vertical posts that form the skeleton of one of the trailer's side walls. Defendants also point the Court to the specification, which refers to an example in which the "backers share a common facer [] so that the facer passes over the front surface of all vertical posts in the side wall." ('018 Patent, col. 8:9-13; Fig. 22.) The Court does not, however, conclude that claim 23 requires one common facer that covers an entire side wall of the trailer. First, the description of one possible embodiment in the specification cannot be read to limit claim 23 because there is no clear disavowal of claim scope. Second, referring back to claims 14, 15, and 16, there is no indication that the vertical posts referenced in claim 23 are all of the vertical posts of one of the side walls. Accordingly, the Court construes the phrase "said plurality of liner panels include a plurality of discrete said backers sharing a common said facer, so that said common facer covers said vertical posts" to mean that "at least two of the liner panels include at least two backers that share a common facer so that the common facer for the liner panel covers the vertical posts to which the liner panel is attached."

## 2.   "Recess" or "Area Depressed"

The parties dispute the meaning of the terms "area depressed" and "recess," which refer to an area of the liner panel at or around the head of a fastener that allows the fastener which attaches the liner panel to the vertical post to be countersunk so that it is flush with the inner surface of the trailer.[2]  The parties agree that a "recess" or "area depressed" is an indentation, but they dispute whether the "recess" or "area depressed" is formed before the facer and backer are fastened to the vertical post.  Plaintiff contends that the claims simply require a "recess" or "area depressed" to be present, regardless of when and how it was created, while Defendants argue that a "recess" or "area depressed" must be pre-formed.

In the claims, the facer and backer "define a recess" and the head of the fastener "is received" in the recess.  (Claims 16, 17, and 23 of '493 Patent.)  Defendants argue that if the recess were not to be pre-formed, then the fastener—and not the backer and

---

[2]The specific disputed terms and phrases are: "area depressed" (claims 16, 17, and 25 of '493 Patent); "deflects into said area [depressed]" (claims 16, 17, and 25 of '493 Patent); "define a recess" (claims 16, 17, and 23 of '493 Patent); "define said recess" (claim 25 of '493 Patent); "backer defines an area depressed from said inward side of said backer" (claim 16 of '493 Patent); "facer deflects into said area so that said facer and said backer define a recess" (claim 16 of '493 Patent); "defines an area depressed from said inward side of said backer" (claim 17 of '493 Patent); "define a recess at said inner surface" (claim 17 of '493 Patent); "said recess" (claim 24 of '493 Patent); "recesses" (claim 24 of '493 Patent); "depressed from said inward side of said backer" (claim 25 of '493 Patent); "respective said recesses" (claim 19 of '493 Patent); "received in said recess" (claims 16, 17, and 23 of '493 Patent); and "is received in said recess and abuts said facer" (claim 17 of '493 Patent).

facer—would define the recess in the backer and facer. Defendants also assert that a recess cannot "receive" the head of the fastener if it were formed by the head of the fastener; rather, the recess must exist before the fastener is placed there. Plaintiff contends, however, that the recess can be formed by forcing the fastener head at the time the liner panel is attached to the post. Plaintiff further argues that the method restrictions proposed by Defendants are inappropriate.

Where the patent claims a novel product, methods of manufacture cited in the patent do not limit the product claims. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1375 (Fed. Cir. 2007). "However, process steps can be treated as part of a product claim if the patentee has made clear that the process steps are an essential part of the claimed invention." *Id.* Here, the claims do not specify that the recesses must be pre-formed. The specification states that the recesses may be formed by a variety of methods, including "crushing, cutting, milling, drilling or sanding" the backer or backer and facer together so that the liner's thickness at the recess is reduced. ('493 Patent, col. 8:37-46.) The Court agrees with Plaintiff that at least one proposed method—crushing—does not require the recess or area depressed to be pre-formed; the fastener itself could create a recess during the fastening process. The Court further concludes that the patent does not require a specific method, essential to the claimed invention, of creating the recess.

12

Accordingly, the Court construes the terms "recess" and "area depressed" to mean "indentation."

## 3. **"Received"**

The parties dispute the meaning of the term "received" as used to refer to a fastener being received in a recess.[3]  Part of the dispute involves whether a recess must be pre-formed to "receive" a fastener, as discussed above.  In addition, Defendants claim that the term "received" means that the fastener's head resides "below the inward surface of the panel."  Plaintiff argues that there is no such limitation.  The Court agrees.  The claims at issue recite that the "head portion" of the fastener is "received" in the recess.  (*See, e.g.,* claim 16 of '493 Patent.)  There is no language in the claims suggesting that the fastener head must reside below the inward surface of the liner panel.  Furthermore, the specification states that the fastener heads "may extend out from [the] surface [of the liner panel] but could also be countersunk into recesses . . . so that the heads are at or below the panel surfaces."  ('493 Patent, col. 8:33-37.)  Accordingly, the Court finds that the limitation Defendants propose is not supported by the claims or the specification, and the Court concludes that the term "received" is straightforward and does not call for any construction.

---

[3]The parties dispute the meaning of the word "received" as used in the following related phrases:  "received in said recess" (claims 16, 17, and 23 of '493 Patent) and "is received in said recess and abuts said facer" (claim 17 of '493 Patent).

13

## 4. "Overhang" or "Overhang Portion"

The parties dispute the meaning of the term "overhang" and the following related phrases: "defines an overhang portion that extends beyond an edge of said backer" (claim 1 of '018 Patent); "overhang portion" (claims 1, 3, and 18 of '018 Patent and claims 6, 7, 8, 12, and 22 of '493 Patent); and "defines an overhang portion" (claims 6 and 17 of '493 Patent). Specifically, Defendants argue that the overhang portion must be long enough to fold over the backer or serve to attach the facer to a post and proposes that the term "overhang portion" be defined as "a segment of the facer that is long enough to fold over the backer." Plaintiff contends that the overhang portion must simply extend "beyond an edge of the backer." Defendants appear concerned that under Plaintiff's construction, infringement would exist in a panel where the backer and facer were designed to be the same size but where manufacturing issues resulted in a *de minimis* overhang.

The patents at issue in this action use the term "overhang portion" in a number of claims that do specify whether the "overhang portion" is to be folded over the backer or folded away from the backer so that it may be used to attach the liner panel to a vertical post. (*See, e.g.,* claim 4 of '018 Patent (claiming overhang portion that wraps around the edge surface so that the facer covers at least a portion of the back side of the backer); claim 24 of '018 Patent (claiming overhang portion that folds out to form an edge surface for

attaching the liner panel to a vertical post).)   In the claims
central to this dispute, however, there is no indication of how far
the overhang portion extends beyond the edge of the backer.   The
specification states that "more or less than" one inch of facer can
be left to overhang the backer.   ('018 Patent, col. 6:22-24.)
Defendants contend that the overhang portion must be long enough to
serve a purpose, such as attaching the facer to a post or folding
over the edge of the backer to prevent fraying of the facer.

There is no support in the claim language or the specification
for Defendants' proposed limitation on the term "overhang portion";
nothing requires that it be long enough to fold over the backer.
Therefore, the Court is thus inclined to adopt Plaintiff's proposed
definition.   The Court notes, however, that the claim language and
the specification suggest that the overhang portion must be long
enough to serve some purpose.   Instead of simply specifying that a
facer extends beyond the edge of the backer, the claims define
"overhang portion" as a specific structure.   The specification
recites several functions for the overhang portion.  For example, the
overhang portion may fold over the backer to protect against
fraying—whether or not it wraps around to the backer's opposite side
(*id.* col. 7:5-12), or it may be used to attach the liner panel to a
vertical post (*id.* col. 7:22-27).   Accordingly, it is clear to the
Court that a *de minimis* extension of the facer beyond the edge of the
backer would not be an "overhang portion."   For this reason, the

Court construes "overhang portion" to mean "a portion of the facer that extends more than a trifling amount beyond an edge of the backer."

5.    **"Edge"**

The parties dispute the meaning of the term "edge" and the following related phrases: "edge" (claims 1, 2, and 18 of '018 Patent and claim 7 of '493 Patent); "edge surface" (claims 2, 3, and 18 of '018 Patent and claims 7 and 12 of '493 Patent); "edge of said backer" (claims 17 and 22 of '493 Patent); and "vertical edge" (claim 12 of '493 Patent).  Specifically, Plaintiff contends that "edge" means "a boundary where a thing begins or ends" and that "edge surface" means "a surface where the backer begins or ends that is generally perpendicular to the inner surface of the trailer side wall."  Defendants argue that "edge" means "the end of the backer panel" and that "edge surface" means "the vertical surface at the end of the backer panel."  The parties dispute whether an edge must be at the end of the backer or may be present anywhere a surface ends on the backer.  The Court agrees with Plaintiff that a backer may contain edges not at the end of the panel so that an edge is a place where a surface on the backer begins and ends, but not necessarily where the backer itself begins or ends.  The Court thus adopts Plaintiff's proposed definition of "edge": "a boundary where a thing begins or ends."

16

Based on their representations during the *Markman* hearing, the parties do not appear to dispute the general concept of "edge surface." In light of the Court's construction of the term "edge," the Court adopts Plaintiff's proposed construction and construes "edge surface" to mean "a surface where the backer begins or ends that is generally perpendicular to the inner surface of the trailer side wall." Also in light of the Court's construction of the term "edge," the Court finds that it is not necessary to construe the phrase "edge of said backer." With regard to the term "vertical edge," the *Markman* hearing revealed that there is no real dispute between the parties about the general concept of "vertical edge." In a nutshell, the vertical edge is the corner or boundary between the horizontal surface of the backer and the edge surface. The Court adopts Plaintiff's proposed definition: "a boundary where the backer begins or ends that is generally perpendicular to the ground on which the trailer is located."

## 6. "Flange"

The parties dispute the meaning of the term "flange" and the related phrases: "defines stepped-down flanges on opposite sides of a front face of said post that receive vertical sides of respective said adjacent liner panels" (claim 19 of '018 Patent); "stepped-down flanges" (claim 14 of '493 Patent); and "said flanges" (claim 14 of '493 Patent). Plaintiff argues that the term requires no construction because the phrase "stepped-down flange" is a visually

descriptive phrase that requires no clarification. Defendants counter that the term "flange" is likely unfamiliar to jurors and that clarification of the term using a dictionary is therefore appropriate. The Court agrees. The term "flange" is not used in common parlance. The parties agreed at the *Markman* hearing that a "flange" is a projecting rib or rim for attachment to another object. *Cf.* Oxford American Dictionary 329 (1980) (defining "flange" as "a projecting rim or edge"); Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/flange (defining "flange" as "a rib or rim for . . . attachment to another object"). The Court therefore construes the term "flange" to mean "a projecting rib or rim for attachment to another object." The Court finds that it is unnecessary to construe the terms "stepped-down flanges" or "said flanges" in light of this construction.

### 7.    "Adjacent"

The parties dispute the meaning of the term "adjacent" (claim 13 of '493 Patent) and the related phrase "to a respective said vertical post between said adjacent liner panels" (claim 21 of '493 Patent). The term is used to specify that two items of the same type (e.g., liner panels) are next to each other, even if they are separated by an item of another type (e.g., a vertical post). (*See, e.g.,* claim 1 of '493 Patent (claiming a trailer where "adjacent" liner panels are attached to a "vertical post disposed between" them).)

Plaintiff contends that "adjacent" means "close to or nearby." Defendants argue that "adjacent" liner panels are "next to" each other—and that no other structure of the same kind comes between them. As to the phrase "to a respective said vertical post between said adjacent liner panels," Plaintiff asserts that no construction is necessary, while Defendants propose a definition that "the panels are next to each other."

Both sides agree that two liner panels are "adjacent" to each other if they are near each other and have no other liner panels between them or if they are next to each other but have a vertical post between them. Plaintiff's concern with Defendants' proposed definition is that "next to" implies "abutting." The Court agrees that Defendants' proposed construction may cause confusion, so the Court concludes that "adjacent" means "close to or nearby, but not separated by another item of the same type." In light of this construction, the Court concludes that it need not construe the phrase "to a respective said vertical post between said adjacent liner panels."

CONCLUSION

For the foregoing reasons, the Court construes the disputed terms and phrases as follows:

| Disputed Term or Phrase | Court's Construction |
|---|---|
| Covers | Overlays |
| Said plurality of liner panels include a plurality of discrete said backers sharing a common said facer, so that said common facer covers said vertical posts | At least two of the liner panels include at least two backers that share a common facer so that the common facer for the liner panel covers the vertical posts to which the liner panel is attached |
| Area depressed | Indentation |
| Deflects into said area [depressed] | "Area depressed" and "recess" mean "indentation" |
| Define a recess | "Area depressed" and "recess" mean "indentation" |
| Define said recess | "Area depressed" and "recess" mean "indentation" |
| Backer defines an area depressed from said inward side of said backer | "Area depressed" and "recess" mean "indentation" |
| Facer deflects into said area so that said facer and said backer define a recess | "Area depressed" and "recess" mean "indentation" |
| Define an area depressed from said inward side of said back | "Area depressed" and "recess" mean "indentation" |
| Define a recess at said inner surface | "Area depressed" and "recess" mean "indentation" |
| Said recess | "Area depressed" and "recess" mean "indentation" |
| Recesses | "Area depressed" and "recess" mean "indentation" |
| Depressed from said inward side of said backer | "Area depressed" and "recess" mean "indentation" |
| Respective said recesses | "Area depressed" and "recess" mean "indentation" |
| Received in said recess | No construction necessary |
| Is received in said recess and abuts said facer | No construction necessary |

| Disputed Term or Phrase | Court's Construction |
|---|---|
| Defines an overhang portion that extends beyond an edge of said backer | "Overhang portion" means "a portion of the facer that extends more than a trifling amount beyond an edge of the backer" |
| Overhang portion | "Overhang portion" means "a portion of the facer that extends more than a trifling amount beyond an edge of the backer" |
| Defines an overhang portion | "Overhang portion" means "a portion of the facer that extends more than a trifling amount beyond an edge of the backer" |
| Edge | A boundary where a thing begins or ends |
| Edge surface | A surface where the backer begins or ends that is generally perpendicular to the inner surface of the trailer side wall |
| Edge of said backer | No construction necessary |
| Vertical edge | A boundary where the backer begins or ends that is generally perpendicular to the ground on which the trailer is located |
| Defines stepped-down flanges on opposite sides of a front face of said post that receive vertical sides of respective said adjacent liner panels | "Flange" means "a projecting rib or rim for attachment to another object" |
| Stepped-down flanges | "Flange" means "a projecting rib or rim for attachment to another object" |
| Said flanges | "Flange" means "a projecting rib or rim for attachment to another object" |
| Adjacent | Close to or nearby, but not separated by another item of the same type |

| Disputed Term or Phrase | Court's Construction |
|---|---|
| To a respective said vertical post between said adjacent liner panels | No construction necessary |

IT IS SO ORDERED, this 23rd day of December, 2009.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE